Michelle R Burrows OSB 86160
Attorney at Law
618 NW Glisan Ste. 203
Portland OR 97209
503/241-1955
Michelle.r.burrows@gmail.com
    Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | | |
|---|---|---|
| RYAN HAMMEL, JAMIE HAMMEL | ) | |
| | ) | Case No. |
| Plaintiffs | ) | |
| | ) | COMPLAINT |
| v. | ) | Unreasonable Seizure; Substantive |
| | ) | Due Process; Monell Violations |
| TRI-COUNTY METROPOLITAN | ) | |
| TRANSPORTATION DISTRICT | ) | |
| OF OREGON, (Tri-Met), a political | ) | $4^{th}/14^{th}$ Amendment Violations |
| Subdivision of the State of Oregon, | ) | 42 U.S.C. §1983 |
| SANDI DAY, an individual | ) | |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

1.

Shortly before midnight on April 24, 2010 Defendant Tri-Met set in motion a chain of events

that led to the most destructive crash in its history. It happened when defendant driver Sandi Day

cut illegally across two lanes of traffic, accelerated to 14 miltes per hour, and drover her 17 ton

bus with a known blind spot through a crowded Old Town crosswalk. She says her first sign of

the catastrophe that followed was a girl's hair, floating like the wind directly in front of her. The

crash left a trail of death and broken lives. Sandi Day's Tri-Met Bus 2514 dragged two

unsuspecting young women, Danielle Sale and Jenee Hammel, underneath it for 60 feet.

Unbelievably, they lived, until the bus rolled  repeatedly over them and crushed them to death.

The bus swallowed a young man, Erik Gittings, under its front wheel. When it finally came to

rest, he was forced to listen helplessly to his beloved Danielle die, while he survived with critical

injuries. Ryan and Jamie Hammel, young newlyweds, were thrown to safety. They tried

frantically to help, but could to little but try to comfort Ryan's sister Jenee as she died in front of

them. Unbelievably at each critical step along this rout to catastrophe, Defendant Tri-Met trained

Ms. Day to do exactly what she did.

2.

This action is filed by Plaintiffs under 42 U.S.C. §1983 for violations of due process in violation

of the Fourth and Fourteenth Amendments to the United States Constitution.

3.

This court has jurisdiction over Plaintiffs claims of violations of federal Constitutional Rights

under 28 U.S.C. 1331 and 1343.

4.

Venue is proper under 28 U.S.C. §1391(b) in that one or more of the defendants reside in the

District of Oregon and Plaintiffs claims for relief arose in this District.

**PARTIES**

5.

2
COMPLAINT Ryan and Jamie Hammel

Plaintiff Ryan Hammel resides in Oregon and was struck by Defendant Day while driving her Tri-Met bus in Multnomah County on April 24, 2010. Ryan Hammel is married to Jamie Hammel and is the brother of decedent Jenee Hammel.

6.

Plaintiff Jamie Hammel resides in Oregon and was struck by Defendant Day while driving her Tri-Met bus in Multnomah County on April 24, 2010.

7.

Defendant Tri-County Metropolitan Transportation District of Oregon "Tri-Met" is a municipal corporation organized under the laws of the State of Oregon and is a special district entitled to be sued in its own capacity.  Tri-Met is a person for purposes of 42 U.S.C. §1983. Tri-Met employed Defendant Day at the time of the incident alleged herein. At all material times Tri-Met was operating under color of law.

8.

Defendant Day is an individual who was employed by Tri-Met as a municipal bus driver and was the driver of the bus which struck a group of pedestrians on April 24, 2010 in Multnomah County. She was acting under the color of law at the time of the incident in her capacity as a municipal bus driver employed by Tri-Met. She is sued in her individual capacity.

9.

John Does 1-5 are supervisors working for Tri-Met who were responsible for supervising and training Defendant Day in the various illegal actions she took on April 24, 2010. Some of the John Doe Defendants are not well known at this time but will be added through amendment to this litigation at such time as their identity is known.

3
COMPLAINT Ryan and Jamie Hammel

10.

Plaintiffs are entitled to an award of attorneys fees and costs pursuant to 42 U.S.C. 1988.

**STATEMENT OF FACTS**

11.

Just before midnight on April 24, 2010, Defendant Tri-Met set in motion what it has called "without a doubt, the worst accident in Tri-Met's history." Tri-Met and Defendant Day are defendants in a series of lawsuits now pending in Multnomah County for damages to all the victims for the conduct causing the accident. All the victims of that accident have filed suit.

12.

Similarly, all plaintiffs are simultaneously filing federal actions for the civil rights claims held by the crash victims, the parents of the decedents and the children of the decedents.

13.

Tri-Met driver Defendant Day was driving a route she was unfamiliar with on April 24, 2010 near midnight when she made an unscheduled stop to allow her sole remaining passenger to disembark. The unscheduled stop was at a bus shelter designed for a different route on the far right lane of a two lane one way street, NW Glisan. The streets are narrow in Portland's Old Town where this stop occurred. This bus stop is only several feet from the extremely busy and normally heavily travelled Broadway. This intersection is also the last major intersection before Broadway crosses the Broadway Bridge.

COMPLAINT Ryan and Jamie Hammel

14.

The area of town where the accident occurred is frequented by numerous pedestrians as it is near the bus and train stations, Harvey's Comedy Club, and a number galleries and restaurants.

15.

Defendant Day wears colored glasses she claims she needs to wear for reading in order to read the gauges on her dashboard. She also claims it cuts down on glare. Pigment added to glasses decreases the ability to see. The accident occurred late at night and these glasses made it more difficult for her to see in shadows.

16.

On that evening of April 24, 2010, Defendant Day was driving Tri-Met bus 2514 on Tri-Met route No. 9.  The bus weighed 17 tons when empty, and measured 8 ½ feet across and 41 feet long.  It contained a significant view obstruction for all of its drivers—a thick steel A-pillar to the left of the driver's cockpit that partially blocked their view of pedestrians who were on, or coming from, their left.  It also contained an even more significant view obstruction for drivers like Defendant Day, who was 5 feet 3 inches tall.  Immediately to the left of the A-pillar, a large rear-view mirror assembly measuring 8 ½ inches by 18 inches was attached to the outside of the bus at a level just below Defendant Day's head.  This assembly blocked even more of Defendant Day's view of pedestrians on and coming from her left, in the manner shown in the post-collision police photograph attached as Exhibit 1.  Ms. Day had been taught by Tri-Met supervisors and instructors how to compensate for this obstruction.

5
COMPLAINT Ryan and Jamie Hammel

17.

The visual obstruction of the A pillar and driver's-side rear view mirror assembly was the subject of several past complaints to Tri-Met about visibility problems for drivers. Tri-Met was aware of this visual obstruction and took no steps to correct it or to adjust the buses in any way to overcome it. Instead Tri-Met taught its drivers to attempt to compensate for the obstruction by "rocking and rolling" –a maneuver that is extremely difficult for a short, stout driver to perform in the cockpit confines of a New Flyer los floor bus such as bus 2514.

18.

Defendant Day began her shift at 5:36 p.m. on the evening of April 24, 2010.  A little over six hours later, the end of her route took her through downtown and near Northwest Portland.  At 11:55 p.m. she was driving Bus 2514 north on Sixth Avenue through Portland's Old Town.  After reaching Northwest Glisan she planned to turn left and drive the single block over to Broadway.  From there she planned to turn left again to go south on Broadway, and drive back to Tri-Met's Powell Street garage to complete her shift and go home.  This was not her usual route.

19.

At 11:56 p.m. Defendant Day turned left onto Northwest Glisan from Sixth.  She was directly across from Harvey's Comedy Club.  She saw many people leaving the comedy club and knew that it was emptying for the night.

6
COMPLAINT Ryan and Jamie Hammel

20.

As Defendant Day turned left onto Glisan she had one remaining passenger on her bus.  The

passenger was an elderly security guard coming home from work  Day asked the passenger

where he lived and offering a courtesy stop at Glisan/Broadway.  He told Day he did not need to

be dropped off at the Glisan/Broadway stop, but was willing to get off on the next stop on

Broadway.  Defendant Day decided instead to drop him off at an unscheduled courtesy stop for

route 9 at the Broadway and Glisan stop.. Day did not testify accurately about this fact at her trial

21

Official Tri-Met policy requires bus drivers to make such stops for elderly riders after 8 p.m. The

Amalgmated Transit Union Local 757  instruct drivers not to make courtesy stops downtown in

any circumstance.  Tri-Met does not follow this direction. This specific bus stop allows virtually

no room for a bus to re-enter the proper left turn lane before turning left.

22.

Defendant Day made the courtesy stop at a bus shelter at the northeast corner of Glisan and

Broadway..  This shelter was intended for another bus line that continued straight west on Glisan,

rather than turning left onto Broadway. Glisan at this location is a westbound, one-way, two-lane

street with a parking lane on both sides of the street.  Defendant Day was on the right side of

Glisan when she made her unscheduled stop at the bus shelter.

23.

A Portland Police Bureau diagram of the collision scene and its aftermath is attached as Exhibit

2.

7
COMPLAINT Ryan and Jamie Hammel

24.

Just before midnight on April 24, 2010 as Defendant Day neared her unscheduled stop there were numerous pedestrians walking on the south sidewalk of Glisan. Defendant Day recalls seeing several pedestrians on the sidewalk that night. Other witnesses recall hearing laughter and approximately ten individuals walking west on Glisan on the south sidewalk toward Broadway. The cross walk goes across Broadway and is parallel to Glisan. The bus stop is very close by.

25.

Defendant Day sits in the bus  high above the road. She has several mirrors which are large and can obstruct her visibility if she does not compensate. The bus is equipped with nine different cameras which sit at various vantage points around the body of the bus.

26.

Defendant Day stopped her bus on Glisan partially in the north (number one) lane with one car ahead of her.  She discharged her passenger. A second car was ahead of her bus in the number two lane to her left. At this location there is a parking lane and several parking spots along the northside of Glisan. Defendant Day recalls seeing some pedestrians. A third car approached from behind her in the number two lane. While Defendant Day focused on that car she was not looking forward into the intersection or at the pedestrians she knew were present. After a third car passed her, Defendant Day accelerated her bus across two lanes of Glisan before more cars could come from behind her. She had a large view obstruction from her left rear view mirror as she did so. Defendant Day entered the intersection of Glisan and Broadway driving at 14 miles per hour in an arcing turn. She then drove her 17 ton bus south on Broadway and directly into the

8
COMPLAINT Ryan and Jamie Hammel

group of five unsuspecting young adults. These young people were in the protected crosswalk and were crossing properly with the walk light.

27.

The group of pedestrian consisted of family and friends who had gone out that Saturday night to a show at Harvey's Comedy Club, at 421 N.W. Sixth Avenue in Portland.  Ryan and Jamie Hammel were newlyweds.  Their friends Danielle Sale, age 22, and Erik Gittings, age 23, lived together and were contemplating marriage.  Ryan's sister Jenee was a young mother planning her upcoming August 28th  wedding.

28.

The comedy show was full that night with 260 customers in the audience.  It ended at 11:45 p.m. and customers began to leave.  Ryan and Jamie Hammel's group was one of the last to leave. Ryan and Jamie with their friends went out the comedy club door on the southeast corner of Northwest Sixth Avenue and Glisan Street.  They crossed Sixth Avenue heading west on Glisan Street's south sidewalk.  They had very little to drink, they were in full control of their faculties, and they were laughing, talking and walking in an appropriate manner.

29.

After dropping off her last passenger, Defendant Day waited for the traffic light to turn green. At 11:57 it did, and she began her left turn onto Broadway.  She knew the night sky was dark and overcast.  She knew the intersection was dimly lit and contained many shadows.  She knew her view to the left was obstructed by the A-pillar and rear view mirror assembly. She knew space was tight in the driver's cockpit and that she could not move easily in her seat to see around the view obstruction.  She knew she was turning left illegally from the right of two westbound lanes,

9
COMPLAINT Ryan and Jamie Hammel

and that she would have to cross two lanes and drive through traffic coming behind her on the left in order to make her turn.  She knew that as she began her turn she would have to fix her attention behind her on the left to make sure she would not pull into cars coming from behind her. She knew that she had kept her attention fixed behind her, and not ahead at the intersection, after the light changed while several cars passed her.  She knew that many pedestrians were in the area, because she had seen them leaving Harvey's Comedy Club only one block away.  She knew that pedestrians were crossing Broadway along the left side of Glisan, because she had seen some of them complete the crossing. She knew that she had to look for movement to compensate for the mirrors. Instead of pulling over to block traffic and wait for the next light, she accelerated quickly keeping her attention behind her instead of into the roadway in front of her.

30.

As Defendant Day drove through the intersection at Glisan and Broadway, she also knew that Oregon law required her to check and stop for pedestrians before crossing the oncoming travel lanes.  She knew that Oregon law required her to drive slowly through turns at intersections. She knew that a safe speed during such turns was no more than 5 miles per hour.  She knew that safe practice required her to turn through the intersection with her foot covering the brake.  Defendant Day, however, in the face of the conditions and all her knowledge alleged above, made a conscious and deliberate choice to ignore these clear and well established legal and safety requirements. Instead of driving at no more than 5 miles per hour she chose to drive through the intersection at 12 to 14 miles per hour--2 1/2 to 3 times faster than she knew was safe.  Instead of covering the brake, she chose to accelerate all the way through the intersection and its

10
COMPLAINT Ryan and Jamie Hammel

crosswalks. She did not brake hard and it appears she did not even brake until she knew she had

hit a pedestrian.  Instead of making sure no pedestrians were in her way, she drove through the

south crosswalk exactly as she was trained to do, with knowledge of the likelihood pedestrians

would be crossing in front of her.

31.

While Defendant Day waited to make her planned illegal left turn, the Hammels waited for the

light with their group of friends so they could walk across Broadway to their car in a legally

protected crosswalk.  The group was seen waiting several seconds at the curb for the walk light.

They were heard laughing and having a good time. The intersection is lit on both sides of the

street. The group had no inkling that Bus 2514 would be turning left across their path. After the

light turned green Ryan Hammel stepped off the curb and led the way west across Broadway.

Danielle followed him, holding hands with Erik Gittings, who was on her right, between her and

Glisan Street.  Jamie and Jenee brought up the rear.  Police reports indicate Jamie may have

straggled slightly.  That may have been what saved her life.

32.

The bus may have hit Ryan first.  It plastered him to the left windshield, then threw him to

safety.  The bus hit Jamie with its left side, then threw her clear as well.   The bus also hit Jenee

with its left side.  Instead of knocking her away, it sucked her underneath.  It then crushed Jenee

to death under its two left rear wheels.

33

Ryan Hammel recalls being thrown from the bus as if he had been hit by a ping pong paddle. He

saw his wife thrown free and he saw the other three thrown under the bus. He watched as the bus

11
COMPLAINT Ryan and Jamie Hammel

rolled over his sister. He ran forward and hit the bus driver in the arm to draw her attention

Defendant Day was unaware she had run completely over at least two people. Ryan Hammel

screamed at Day to move the bus back. He was unaware that his friends were stuck under the bus

on the other side. He ran back to his sister and saw that she was wedged sideways between the

bus frame and the ground. Then as he knelt to his sister who was still alive he watched in horror

as the bus moved forward again crushing his sister underneath the wheel. In the meantime Jamie

Hammel was trying desperately to call the police for help.

34.

Ryan watched his sister try to scream but she could make no noise. He watched as she bloated up

as the bus crushed her and then she simply died. He held her head up off the ground while she

lay there and then told her he loved her, kissing her. Another woman was taking Jenee's pulse.

He knew she was dead when he walked away to find his wife.

35.

Defendant Day did not see the group until she saw a girl's hair float like the wind in front of her.

The hair was probably Danielle's.  Danielle and Erik both went down under the right front of the

bus, which has a 14-inch clearance when the bus is not lowered to pick up wheelchair

passengers.  A stiff fiberglass skirt is attached widthwise under the front of the bus just in front

of the front wheels, in order to reduce road spray.  This skirt has a roadway clearance of only

several inches.  Defendant Day dragged Danielle and Erik under the bus for 60 feet along

Broadway before she stopped, leaving drag marks—but no brake or skid marks on the pavement.

Defendant Day then reversed the bus after a bystander, likely Ryan Hammel, told her a woman

was trapped under the left rear wheels.  Defendant Day then pulled the bus forward after another bystander told her people were trapped under the front wheel.

36.

When Bus 2514 finally came to rest, Danielle and Erik were both pinned behind the right front wheel, with their bodies under the bus and their heads almost outside.  Defendant Day turned the bus off, causing it to lower three inches.   Erik's left arm was entangled in Danielle's clothing, and responding EMTs had to cut him free of her in order to extricate them.  As Erik faded in and out of consciousness, both he and the EMTs could hear Danielle making sounds. Then the sounds stopped.  After the EMTs extricated her, Danielle was pronounced dead at the scene.  An ambulance took Erik, who was critically injured, to Emanuel Hospital.

37.

Ryan Hammel had injuries to his back, ankle and some muscle injuries. His greatest injuries were the psychological horror of watching his beloved sister crushed to death while he watched helplessly. He is suffering from ongoing trauma related to this event including recurring flashbacks, nightmares, depression and continued emotionalism. His loss of his sister has impacted his relationship with his family who no longer have everyone present for birthdays, Christmas and other family gatherings.

38.

Jamie Hammel has more significant physical injuries including significant damage to her knee and hips. She received medical attention until she could no longer afford it. She still suffers from debilitating hip and knee pain and injury.  Jamie Hammel also suffers from serious emotional

13
COMPLAINT Ryan and Jamie Hammel

distress from this accident also incurring flashbacks, memories of the accident, the loss of some of her old activities.

39.

A closeup from Exhibit 2, showing how Bus 2514 came to rest in the collision's aftermath, is attached as Exhibit 3.

40.

In acting as she did, Defendant Day was following the official policies, the official practices, and the defective training of her employer Tri-Met and in doing so knowingly violated existing Oregon law.

1. Tri-Met has a policy and practice of encouraging its drivers to accelerate through turns at intersections at speeds of more than 10 miles per hour, even though Tri-Met managing officials state that drivers are supposed to cover the brake and travel no more than 5 miles per hour though the turn. This policy and practice is in violation of Oregon's Motor Vehicle Code.

2. Tri-Met has a policy and practice of encouraging its drivers to illegally cross lanes while turning through intersections, and of illegally turning left from the right lane of a multiple-lane street. This policy and practice is in violation of Oregon's Motor Vehicle Code.

3. Tri-Met has a policy and practice of assigning short-stature drivers to buses with a large A-pillar and rear-view mirror blind spots that they cannot properly see around. Tri-Met has known of the difficulties with visibility through the use of these mirrors/pillars but

has made conscious policy driven choices to make no changes, instead training drivers to adapt to the visibility problems by looking for "movement".

4. Tri-Met has a policy of requiring bus drivers to make unscheduled courtesy stops for elderly drivers after 8 p.m.  Tri-Met requires such stops without regard for the safety of non-riders and without permitting drivers to depart from their preassigned route.

41.

Even though she claims she was acting in accord with Tri-Met policies she knew that each of her actions that night violated the Motor Vehicle Code as noted above. The Motor Vehicle Code of Oregon does not exempt bus drivers from these basic rules of the road. Furthermore, Defendant Day was convicted of  Careless Driving which Plaintiff asks this court to take judicial notice in these proceedings.

42.

At the criminal trial of Defendant Day Tri-Met officials including official trainers and supervisors indicate that Day did nothing wrong, that her actions were in full compliance with all her training and well within the policies of Tri-Met.  These admissions are also incorporated herein.

**FIRST CLAIM FOR RELIEF:** Ryan and Jamie Hammel
Unreasonable Seizure by Day
4th Amendment

42.

Plaintiff incorporates all previously raised allegations as if more fully set forth herein.

43.

15
COMPLAINT Ryan and Jamie Hammel

Ryan and Jamie Hammel  are entitled to be free from unwanted and unreasonable seizure of their persons ; and both are protected from unlawful seizure of their person by and pursuant to the parameters of the 4th and 14th Amendments to the United States Constitution.

44.

The acts and omissions of Defendant Day violated Ryan and Jamie Hammel's protected rights and were an extreme and excessive seizure of their person and were objectively unreasonable based on the totality of circumstances and violated the rights held by Ryan and Jamie, to their life and the integrity of their persons, those rights fully protected by the 4th and 14th Amendments to the United States Constitution.

45.

 The specific acts of Defendant Day, individually and in concert with each other, that Plaintiff claims were objectively unreasonable are more particularly set forth below:

1. Defendant Day made a stop with her bus in such a way as to make the turn she needed to make unreasonably dangerous and illegal;

2. Despite the fact that her bus was too big to safely move into the left lane of NW Glisan Defendant Day chose to drive across two lanes of traffic and make an illegal left hand turn knowing that such a turn violated the law; ORS 811.340(1)(b)

3. Day knew that she had reduced visibility and had a legal duty to maintain extra care in her lookout and she failed to do so by not driving slowly, reviewing the area carefully, making an illegal approach, ignoring the obvious indications of low lighting, the presence of pedestrians and her unfamiliarity with the terrain.

16
COMPLAINT Ryan and Jamie Hammel

4.  Day was clearly aware of pedestrians as she saw them come from the Comedy Club, saw some of them walking and was distracted such that she failed to see the pedestrians standing at the corner of the sidewalk for nearly 30 seconds while she idled her bus only a few feet from them.

5.  Defendant Day chose to speed through the intersection without braking until she hit the pedestrians with her 17 ton bus.  She also provided false information to the police officer investigating the accident by stating she was only going 5 mph and that the pedestrians ran in front of the bus. She plowed into a group of pedestrians that were plainly there for her to see The fact that she claims she did not see them until this point indicates her complete failure to see where she was going.

6.  Day failed to brake until the point of impact and when she did so she failed to assess the situation and determine the next safe steps to take. Instead reacting to the hysteria around her she moved the bus back and forth several times running over the pedestrians at least twice crushing them to death. She claims she did not see any of the passengers until she saw hair flying by. She hit Ryan Hammel directly with the front of her bus. Her seat sits high so that she can see in front of her.

46.

As a result of the violations of the Constitutional standards set forth herein, Ryan and Jamie Hammel were struck and seized by the driver, treated inhumanely and incurred extreme pain and injury when they were wrongfully struck by the Tri-Met bus driven by Ms. Day.

47.

As a result of these Constitutional violations to Ryan and Jamie Hammel and the injuries they

incurred, Plaintiffs seek compensation set forth more specifically in the section of this Complaint

entitled damages.

**SECOND CLAIM FOR RELIEF**: Ryan and Jamie Hammel
14th Amendment Substantive Due Process Claim

48.

Plaintiffs reallege all matters previously set forth and incorporate herein.

49.

Plaintiffs  have the right not to have their life or liberty taken by government action with due

process of law under the 4th and 14th Amendments to the United States Constitution.

50.

The rights protected under the 14th Amendment due process clause bar certain government

actions regardless of the fairness of the procedures used to implement them.  In this situation the

14th Amendment is intended to prevent government officials from acting in ways that employ

their powers as an instrument of oppression or menace or which shocks the conscience.

51.

The substantive due process rights of the 14th Amendment protect against the arbitrary

governmental actions which infringe upon the bodily integrity of any citizen.  When

governmental employees act in such a way they are interfering in fundamental rights  implicit in

the concept of an ordered liberty.

52.

Defendant Day performed her actions alleged above pursuant to her training by officials of

Defendant Tri-Met, and in furtherance of Tri-Met's official policies and practices.  These actions

18
COMPLAINT Ryan and Jamie Hammel

by defendants caused the most absolute infringement and intrusion into a citizen's bodily

integrity in violation of her constitutionally protected rights under the 14th Amendment to be free

from oppressive and menacing governmental action that causes death or great bodily harm in a

reckless or callously indifferent manner.

53.

As a result of the reckless and callously indifferent acts of Defendant Day in following Tri-Met's

training, policies and practices, Plaintiffs have been physically injured for the rest of their life,

have the psychological terror of remembering being assaulted by a 17 ton bus, watching a

beloved sister die crushed to death beneath the tires of the bus after it rolled over them

repeatedly.


**THIRD CLAIM FOR RELIEF:** Ryan and Jamie Hammel
Monell Claim Tri-Met
Custom, Practice or Culture: Violate the Law
4th Amendment


54.

Plaintiff realleges all previously matters as if more fully set forth herein.

55.

At all times herein Tri-Met had an official and unofficial policy or practice which promoted,

allowed and even mandated bus drivers to violate traffic laws while driving city buses. The

specific policies and practices are more fully outlined previously. These policies including

making illegal turns, driving in excess of safe speed, violation of the basic rule, failure to keep a

look out, insistence on intentionally using unsafe and poorly designed buses.

56.

19
COMPLAINT Ryan and Jamie Hammel

As a result of the unconstitutional official and unofficial policy or practice which was promoted, allowed or required within Tri-Met Defendant Day drove in violation of the law which was a significant if not primary factor in the incident of April 24, 2010 and the resulting injuries suffered by Plaintiffs.

57.

As a result of the unofficial policy, custom or practice to drive in violation of the law and to place cost, expediency and timely route schedules over human safety, these Plaintiffs and others were subjected to unreasonable seizure and enormous physical and emotional injury.

**FOURTH CLAIM FOR RELIEF**: Jamie and Ryan Hammell
Monell Claim Tri-Met
Policy Practice Custom and Culture of Inadequate Training
42 U.S.C. §1983

58.

Plaintiff realleges all previous matters as if fully alleged herein.

59.

At all times herein Tri-Met had an unofficial policy, custom or practice which promoted, allowed or facilitated the training of bus drivers to violate motor vehicle laws.

60.

As a result of the unofficial policy, custom or practice of Tri-Met in training bus drivers to ignore or violate well established motor vehicle laws Defendant Day drove her bus in accordance with this training into a group of pedestrians which included Plaintiffs causing them significant physical and emotional injuries. This training policy was unconstitutional per se and was the significant and driving cause of the injuries suffered by Plaintiffs.

20
COMPLAINT Ryan and Jamie Hammel

## DAMAGES

61.

As a result of all the conduct previously alleged which is incorporated herein, Plaintiffs incurred damages as set forth:

62

Ryan Hammell incurred economic damages thus far for medical care for headaches, slurred speech, pain and damages to his low back. Ryan Hammell also incurred noneconomic damages for the extraordinary emotional impact of this accident which included watching his sister die before his eyes. Plaintiff Ryan Hammell suffered from depression, sleeplessness, headaches, flashbacks, post traumatic stress syndrome which is still ongoing, grief, pain and emotional loss. Ryan Hammell is in need of ongoing therapy to address his grief and traumatic loss issues. These damages cannot be fully calculated at this time.

63.

Jamie Hammell incurred economic damages thus far for medical expenses of $29,460.07 but she is not fully medically stationary at this time. As a result of injuries to her knee and hips she has suffered swelling, fluid retention that is unremitting and notably weakness in her left knee, serious pain to her right shoulder, pain and weakness in her hip, neck pain, contusions and ongoing muscle spasms which make walking, standing or sleeping difficult. The ongoing pain and muscle spasm issues create pain which has effected her daily life including her work. Some of these physical injuries may be permanent.

21
COMPLAINT Ryan and Jamie Hammel

64.

Jamie Hammell has also experienced the terror of being hit by a bus and thrown onto the pavement, the terror of believing she might die, extreme fear, depression, emotional distress which all induced sleeplessness, sadness, grief, flashbacks as she and her husband cope with the significant personal and emotional losses from this accident. These damages cannot be calculated at this time but will be so for trial.

WHEREFORE Plaintiffs pray for judgment as follows

1. Both plaintiffs seek orders that Tri-Met and Day violated the Constitution when they unreasonably seized Plaintiffs

2. Both plaintiffs seek orders that Tri-Met and Day violated the Constitution when they unreasonably, with intent and with a gross disregard for the safety and well being of citizens invaded the bodily integrity of Plaintiffs;

3. Ryan Hammel seeks judgment in an amount to be more fully determined at trial to include compensation for his economic and noneconomic losses

4. Jamie Hammel seeks judgment in an amount to be more fully determined at trial to include compensation for her economic and noneconomic losses.

Dated this 20th day of April 2012

Respectfully submitted,

/s/Michelle R Burrows
Michelle R. Burrows OSB86160
Attorney at Law
618 NW Glisan Ste. 203
Portland OR 97209

22
COMPLAINT Ryan and Jamie Hammel

23
COMPLAINT Ryan and Jamie Hammel

COMPLAINT Ryan and Jamie Hammel