IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**RYAN HAMMEL and JAMIE HAMMEL**,

Plaintiffs,

v.

**TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON and SANDI DAY,**

Defendants.

No. 3:12-cv-00706-MO
Consolidated-Lead

OPINION AND ORDER

---

**DAVID B. SALE, individually and in his capacity as personal representative for the ESTATE OF DANIELLE NICOLE SALE, and JEANETTE L. SALE,**

Plaintiffs,

v.

**TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON and SANDI DAY,**

Defendants.

No. 3:12-cv-00708-MO
Consolidated

---

**ROBERT ERIK GITTINGS,**

No. 3:12-cv-00709-MO
Consolidated

Plaintiff,

v.

**TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON and SANDI DAY,**

Defendants.

---

**VICKI FLYNN, individually and in her capacity as personal representative for the ESTATE OF JENEE HAMMEL, and K.M. by and through his Guardian ad Litem, DANIEL MARCIANO,**

No. 3:12-cv-00710-MO
Consolidated

Plaintiffs,

v.

**TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON and SANDI DAY,**

Defendants.

**MOSMAN, J.**,

Near midnight on April 24, 2010, bus operator Sandi Day struck five people in a crosswalk while driving a Tri-County Metropolitan Transportation District of Oregon ("TriMet") bus. Two of those people died, and the other three were injured. It was the worst bus/pedestrian collision in TriMet history.

Plaintiffs have filed parallel state court and federal court actions. In the state court actions, plaintiffs seek many millions of dollars in damages based on claims for products liability, negligence, and wrongful death. (Pope Decl. [60] Exs. 5–6, 19.) Those actions are set for trial later this summer. Here, plaintiffs assert claims against Ms. Day and TriMet under 42 U.S.C. § 1983 for violations of their substantive due process rights. (Am. Compls. [42–44, 45].)

After careful consideration of the parties' pleadings and arguments, I find that Ms. Day did not deprive plaintiffs of their substantive due process rights and, alternatively, that she is entitled to qualified immunity. In addition, I find that municipal liability may not attach in the absence of individual liability in these consolidated actions. Therefore, Ms. Day's motion for summary judgment [64] is GRANTED, TriMet's motion for summary judgment [67] is GRANTED, and plaintiffs' motion for partial summary judgment [58, 62] is DENIED.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the court must view all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

## DISCUSSION

### I. <u>Individual Liability</u>

#### A. *Facts*

On April 24, 2010, Ms. Day arrived for work around 3:00 p.m. and began her run on the No. 9 bus line at 5:56 p.m. (Eden Decl. [66] Ex. 1 at 20.) Sometime before midnight, Ms. Day picked up an elderly male passenger who requested to be dropped off near his home in the Pearl District. Ms. Day agreed to make a courtesy stop at an established bus stop on the No. 17 bus line, just east of NW Glisan's intersection with NW Broadway. (*Id*. [66] Ex. 1 at 21–24.) This stop was not on her regular bus line, but TriMet policy permitted evening courtesy stops.

Before making the courtesy stop, Ms. Day dropped off her only other passenger on NW Sixth Avenue near the intersection with NW Flanders. She then continued north on NW Sixth Avenue and made a left-hand turn onto NW Glisan. Ms. Day made her courtesy stop at the bus shelter on the northern curb of NW Glisan, just thirty-two feet short of the intersection with NW Broadway. (*Id*. [66] Ex. 1 at 25–27; Thompson Decl. [100] Ex. 19 at 3–4.)

Although it was late, there was significant foot traffic in the area at that time because a show at a nearby comedy club had just ended. (Thompson Decl. [100] Ex. 13 at 5; Hysmith Decl. [101] ¶¶ 4–9.) However, visual obstructions on the left side of the bus made it difficult for Ms. Day to see pedestrians crossing NW Broadway to her left. These obstructions included a steel and fiberglass pillar, referred to as the "A-pillar," and an exterior rearview mirror set, consisting of a ten-inch by eleven-inch flat mirror above a six-inch diameter convex mirror. (Thompson Decl. [100] Exs. 7–9.)

After the elderly male passenger exited the bus, Ms. Day waited for the traffic signal to turn green. In this area, NW Glisan was a one-way street with two westbound lanes, and NW

Broadway was a two-way street with one northbound and two southbound lanes. There was one car in each of NW Glisan's two lanes that were also waiting at the traffic signal. (Hysmith Decl [101] Ex. 28.) When the signal turned green, a third car approached from behind Ms. Day's bus in the second lane to her left. Ms. Day waited for the two cars ahead of her to move through the intersection and for the third car approaching from behind to pass her on the left. (*Id*. [101] Ex. 30.) She then accelerated left across both lanes of NW Glisan onto NW Broadway at twelve to fourteen miles per hour. (Thompson Decl. [100] Ex. 14 at 27–28.) Although Ms. Day scanned the area to her left, she did not see a group of five pedestrians in the crosswalk. (Eden Decl. [66] at 28–30.) Sadly, as Ms. Day completed her turn, she struck all five. Jenee Hammel and Danielle Sale died at the scene of the accident. Ryan Hammel, Jamie Hammel, and Erik Gittings were injured but survived.

### B. *Constitutional Torts*

Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a federal constitutional or statutory right was violated; and (2) that the alleged violation was committed by a person acting under the color of state law. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). Here, plaintiffs claim that Ms. Day violated their right to travel and their right to be free from deliberate indifference to life. (Am. Compl. [43] ¶¶ 37–43.) I will analyze these substantive due process claims as independent bases for § 1983 liability.

#### 1. Right to Travel

Plaintiffs' less developed claim is that Ms. Day interfered with their fundamental right to travel on public streets and sidewalks. The circuits are split as to whether the Constitution

guarantees the fundamental right to intrastate travel. *Compare Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (recognizing a fundamental right to travel locally through public spaces and roadways and therefore striking down an ordinance barring drug convicts from "drug exclusion zones") *with Wright v. City of Jackson*, 506 F.2d 900, 902–03 (5th Cir. 1975) (finding no fundamental right to intrastate travel and therefore upholding an ordinance that required city employees to live within the city). The Supreme Court and Ninth Circuit have declined to decide the issue. *See Memorial Hosp. v. Maricopa Cnty*, 415 U.S. 250, 255–56 (1974); *Nunez v. City of San Diego*, 114 F.3d 935, 944 n.7 (9th Cir. 1997). I find it highly improbable that the Ninth Circuit would recognize a fundamental right to intrastate travel absent some form of absolute or intentional interference, such as the ordinances described above. Therefore, to the extent that this theory is intended as an independent basis for § 1983 liability, I grant Ms. Day's motion for summary judgment.

### 2. Substantive Due Process under *Lewis*

Plaintiffs' core claim is that Ms. Day deprived them of their substantive due process right to be free from deliberate indifference to life from public bus operators while traveling on public streets. In *County of Sacramento v. Lewis*, the Supreme Court set out the test for substantive due process claims arising out of common law tort scenarios. 523 U.S. 833 (1998). The Court held that in order to challenge an executive action on substantive due process grounds in these scenarios, a plaintiff must show that the defendant's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8. This elevated standard exists because the Fourteenth Amendment was not intended as "a font of tort law to be superimposed upon whatever systems may already be administered by the States," such as the state wrongful death claims arising out of this accident. *Paul v. Davis*, 424 U.S. 693, 701 (1976).

Although the state actor's conduct is evaluated along a spectrum of culpability, courts have focused on two standards that satisfy the "shocks the conscience" test: (1) purpose to harm and (2) deliberate indifference. *Lewis*, 523 U.S. at 848–50; *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The purpose to harm standard requires a showing that an official acted "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 853 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). This standard applies where officials must "act decisively" and make decisions "in haste, under pressure, and frequently without the luxury of a second chance." *Id.* (quoting *Whitley*, 475 U.S. at 320). In contrast, the deliberate indifference standard requires that "a person . . . 'consciously disregar[d]' a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (quoting Model Penal Code § 2.02(2)(c)). This standard applies "only when actual deliberation is practical." *Lewis*, 523 U.S. at 851.

**a) An Uneasy Fit**

The parties disagree about whether the appropriate standard here is purpose to harm or deliberate indifference. In large part, this disagreement is attributable to the fact that this case does not fit either standard perfectly. The quintessential purpose to harm case is a high speed police chase. *See, e.g.*, *id.* at 836–37. In such cases, the state actor "face[s] an evolving set of circumstances that [take] place over a short time period necessitating 'fast action' and presenting 'obligations that tend to tug against each other.'" *Porter*, 546 F.3d at 1139 (quoting *Lewis*, 523 U.S. at 853).

This case is like the quintessential purpose to harm case in three ways. First, Ms. Day faced an evolving set of circumstances. The elderly male passenger, the pedestrians on the street, and the movement of other vehicles all required Ms. Day's attention as a public bus operator.

Furthermore, left-hand turns are especially difficult due to a variety of operational factors beyond pedestrian and vehicle awareness. The interplay between these factors as Ms. Day attempted to reenter traffic makes this look like a purpose to harm case.

Second, all of Ms. Day's allegedly wrongful conduct occurred over a short period of time necessitating fast action. Within the span of ten seconds, Ms. Day dropped off her courtesy stop passenger, waited for the traffic signal to turn green, observed three cars move forward to her left, scanned the intersection, and made her turn. The turn itself took only two seconds.[1] (Hysmith Decl. [101] ¶¶ 24–27.) This ten-second period of time is, of course, much shorter than the typical high speed chase.

Third, like all public bus operators, Ms. Day was presented with competing public obligations. Ms. Day was expected to ensure the safety of her elderly male passenger. She was expected to reenter traffic so as not to endanger pedestrians or other vehicles on the road. But she was also expected to do all of this on a schedule. Public bus operators must keep moving to get us all from *A* to *B* on time. As a result, they cannot make each move at the slowest possible speed. The tug of these competing obligations makes this resemble more typical purpose to harm cases.

In certain respects, however, this case seems like an uneasy fit for the purpose to harm standard. Ms. Day was not responding to an emergency. The evolving set of circumstances here was much narrower than that involved in a high speed chase. As a result, a state actor in a high speed chase must make split-second judgments with a far greater range of potential outcomes

[1] At oral argument, plaintiffs argued that the relevant time period should be measured from the time Ms. Day agreed to make the courtesy stop for her elderly male passenger, approximately six minutes before the collision. I disagree. In my view, the relevant time period must be anchored to the defendant's wrongful conduct, and merely agreeing to make the courtesy stop was not wrongful. Furthermore, as explained below, even if the relevant time period were six minutes, my analysis would remain the same because those six minutes would still represent a continuous series of events precluding actual deliberation.

than those faced by Ms. Day. Furthermore, the competing obligations she faced were qualitatively different from those implicated in a high speed chase where any choice available to the officer poses the risk of death and where many of the evolving circumstances are caused by the fleeing suspect, not the officer.

Nevertheless, in my view the fundamental question in deciding whether to apply the purpose to harm or deliberate indifference standard is whether "actual deliberation" was practical. When "actual deliberation" is practical, the deliberate indifference standard applies. And for the term "actual deliberation" to do any work, it must mean something more than the ability to change course. Even in the quintessential purpose to harm case, the police officer has some ongoing ability to decide whether to pursue the suspect or call off the chase. Actual deliberation, therefore, implies that the state actor must have the ability to take a step back and reflect on her course of conduct. As the Supreme Court put it, actual deliberation cases are characterized by "extended opportunities to do better . . . teamed with protracted failure to even care." *Lewis*, 523 U.S. at 853. In such cases, the court will find a substantive due process violation if the state actor consciously disregards a substantial risk of serious harm.

In contrast, actual deliberation is impractical where the relevant chain of events is continuous and evolving. These cases are characterized by decisions made "in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 853 (quoting *Whitley*, 475 U.S. at 320). In such cases, the purpose to harm standard applies. The state actor's conduct may go on for a relatively extended period, but unless there is some break in the chain of events, the court will not find a substantive due process violation absent a showing that the state actor acted "maliciously and sadistically for the very purpose of causing harm." *Id.* (quoting *Whitley*, 475 U.S. at 320–21).

Here, the relevant chain of events occurred during the ten seconds between the time Ms. Day made her courtesy stop and the time she hit the victims. This short period did not afford her extended opportunities to do better. It did not allow her to take a step back and reflect on her options. Rather, the undisputed evidence reveals a continuous and evolving chain of events during which Ms. Day had to balance competing obligations under pressure. Therefore, I find that actual deliberation was impractical and, as a result, that the purpose to harm standard applies.

**b) Application of Purpose to Harm Standard**

If the proper standard is purpose to harm—and I find that it is—Ms. Day argues that she is entitled to summary judgment because there is no evidence that she acted maliciously and sadistically for the very purpose of causing harm. (Mem. [65] at 15.) I agree. Ms. Day's undisputed sworn testimony is that she never saw the group of pedestrians in the crosswalk before the collision. (Eden Decl. [66] Ex. 1 at 30.) And even assuming Ms. Day was aware that pedestrians were out on the sidewalks that night, awareness of a generalized risk of harm in executing a left-hand turn does not meet the standard.[2] Consequently, I find that Ms. Day did not deprive plaintiffs of their substantive due process rights, and I therefore grant her motion for summary judgment.

**c) Application of Deliberate Indifference Standard**

The question of which standard to apply is a close one, so I will analyze this motion under the deliberate indifference standard in the alternative. To satisfy this standard, a plaintiff must show that the state actor (1) consciously disregarded (2) a substantial risk (3) of serious harm. At oral argument, the parties seemed to agree that every time a bus operator gets behind

[2] Indeed, at oral argument, plaintiffs conceded that Ms. Day would be entitled to summary judgment if the standard were purpose to harm.

the wheel, she is engaging in an activity with a risk of serious bodily injury or death. In fact, we all assume that risk whenever we drive. And every time we choose to drive anyway, we disregard that risk of serious harm to a certain extent, even if we rarely think of it in those terms.

The deliberate indifference standard requires more. First, the risk of serious harm must be substantial. In this context, that means the risk must be greater than the normal risks faced by all bus operators when they are on the road. Here, plaintiffs allege that the risk was substantial based on a combination of factors: (a) Ms. Day made the courtesy stop less than one-hundred feet from the intersection where she made a left-hand turn; (b) rather than initiating the turn from the far left lane, Ms. Day crossed two lanes of traffic: (c) she accelerated at twelve to fourteen miles per hour; and (d) she failed to adequately take into account the visual obstructions on her left-hand side. At summary judgment, the combination of these factors is certainly sufficient to create a genuine issue of material fact as to whether the risk disregarded by Ms. Day was substantial.

Second, the state actor must *consciously* disregard a substantial risk. The word "consciously" implies a level of particularized awareness. As the Supreme Court has cautioned, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849. Relying on *Lewis*, Ms. Day argues that the conscious disregard requirement means that plaintiffs must show that she "knew that there was a substantial risk that her actions would result in serious injury to the specific pedestrians" she struck. (Reply [134] at 12.) Although I agree that plaintiffs must show that Ms. Day was aware that there was a substantial risk that her actions would result in serious injury, I do not believe the conscious disregard standard requires a showing that she saw these specific pedestrians in the crosswalk before she struck them. Evidence that Ms. Day knew there was heavy foot traffic in the area,

dangers, and a policy of inadequate training. (Am. Compl. [43] ¶¶ 44–54.) Because I find that Ms. Day did not deprive plaintiffs of their substantive due process rights and that municipal liability may not attach in the absence of individual liability here, TriMet is entitled to summary judgment on all of plaintiffs' *Monell* claims.

### A. *Additional Facts*

All of plaintiffs' *Monell* claims address the content and adequacy of the training received by Ms. Day. A brief overview of TriMet training is therefore essential to evaluating plaintiffs' claims.

#### 1. Training Overview

TriMet's training department consists of a manager of training operations, an assistant manager, an administrative assistant, and seventeen training supervisors. (Morgan Decl. [76] ¶ 2.) Eleven training supervisors oversee new hire training. New operators must go through a pre-employment screening process, including a "fit test" that requires new hires to sit in both low-floor and high-floor buses to demonstrate that they can perform all the necessary functions to operate a bus, including the "rock and roll" technique, which teaches drivers to rock back and forth in their seat to see around any visual obstructions. (*Id.* [76] ¶ 8.) New hires must also complete a six-week training program, which includes "cone" exercises, on-the-road driving exercises, commercial driver's license testing, in-service training, and a final written test. (*Id.* [76] ¶ 9.) After this initial training, new operators enter a six-month probation period during which they receive monthly in-service evaluations and a monthly probationary training class. (*Id.* [76] ¶ 10.)

Operator training continues after the probationary period ends. The training supervisors provide refresher training to any operator who has been off work for any reason for thirty days or

more, conduct in-service evaluations of operator safety and customer service performance, and provide one-on-one training to operators, both in the classroom and on the road. (*Id*. [76] ¶ 7.) The training supervisors provide follow-up in-service evaluations and shorter operator trainings as needed, and conduct an eight-hour defensive driving workshop for operators who receive a second preventable accident designation in a two-year period. (*Id*. [76].) TriMet also puts ghost riders on buses to observe the performance of its operators and regularly uses radar guns to document bus speeds. (*Id*. [76] ¶ 17; Van Hagen Decl. [75] Ex. 23 at 6.)

### 2. Ms. Day's Training

Ms. Day's training followed the pattern outlined above. She was hired as a bus operator in June 2007. TriMet provided her with six weeks of new hire training, which covered defensive driving, customer service, acquiring a commercial driver's license, and rules of the road in Oregon. About 75% of the operator training was done behind the wheel of a TriMet bus, and it included instruction on the "rock and roll" technique. (Van Hagen Decl. [75] Ex. 17 at 10–13, 19–25.) In addition, Ms. Day testified that she was trained to make turns at a "safe and reasonable" speed. (*Id*. [75] Ex. 19 at 8–9, 19.)

### B. ***Municipal Liability Generally***

A government entity may be held liable as a "person" under § 1983 in certain circumstances. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish liability for a government entity under *Monell*, a plaintiff must prove that "(1) she was deprived of a constitutional right; (2) the [government entity] had a policy; (3) the policy amounted to deliberate indifference to her constitutional right; and (4) the policy was the 'moving force behind the constitutional violation.'" *Mabe v. San Bernardino Cnty Dep't of Pub. Soc. Servs.*,

237 F.3d 1101, 1110–11 (9th Cir. 2001) (quoting *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996)).

In addition to claims based on an official policy, a plaintiff may assert *Monell* claims based on a custom or a failure to train. "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Similarly, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). But, as the Supreme Court has cautioned, "[a] municipality's culpability for deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purpose of failure to train." *Id*. at 1360 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 409).

**C. *Municipal Liability in the Absence of Individual Liability***

Whether municipal liability may attach in the absence of individual liability is the central question in TriMet's motion for summary judgment. As other courts have noted, this question "has provided stumbling blocks . . . since [courts] first tackled the subject." *Ostling v. City of Bainbridge Island*, 2012 WL 4480550 (W.D. Wash. Sept. 28, 2012). Five cases inform my analysis. In *City of Los Angeles v. Heller*, the plaintiff brought an excessive force claim against individual officers and a *Monell* claim against the city and members of the city police commission. 475 U.S. 796 (1986). After the individual officers were exonerated, the district court dismissed the *Monell* claims. The Supreme Court agreed, reasoning that "[i]f a person has

suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id*. at 799 (emphasis in original).

In *City of Canton v. Harris*, the Supreme Court addressed municipal liability in the absence of individual liability in the context of a failure to train claim. 489 U.S. 378 (1989). After the plaintiff's arrest, she was taken to the local police station in a patrol wagon. At the police station, officers found her sitting on the floor of the patrol wagon, asked her if she needed medical attention, received an incoherent response, and failed to follow up. *Id*. at 381. At trial, the plaintiff did not assert any claims against the individual officers, and the jury rejected all of her claims against the city except for her claim that the city's failure to train its officers deprived her of her Fourteenth Amendment right to receive necessary medical attention. *Id*. at 381–83. The Supreme Court upheld the verdict, concluding that the city could be held independently liable under *Monell* for failure to train its police officers, even though no individual officers were sued. *Id*. at 392.

In *Hopkins v. Andaya*, the Ninth Circuit addressed the potential for municipal liability in the absence of individual liability. 958 F.2d 881 (9th Cir. 1992). *Hopkins* was an excessive force case: a mentally troubled man took a poorly-trained police officer's baton, and the officer then killed the man in self-defense. *Id*. at 883–84. Finding no genuine issue of material fact, the district court granted summary judgment in favor of the officer. The district court also granted summary judgment in favor of the city and its police chief on the theory that, if the officer was not liable, neither were they. *Id*. at 888. Finding factual conflicts in the record, the Ninth Circuit reversed the district court's grant of summary judgment in favor of the officer. *Id*. In addition, because the district court's grant of summary judgment in favor of the city and police chief was

based derivatively on its grant of summary judgment in favor of the officer, the Ninth Circuit reversed here, too. In dicta, however, the Court stated that "the police chief and city might be held liable for improper training or improper procedure even if [the officer] is exonerated, since they put an officer on the street who is so badly trained and instructed he lets his baton be taken away from him and then has to kill an unarmed civilian to save his own life." *Id.*

The Ninth Circuit addressed this issue again in *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994). In that case, two officers shot and killed an armed suspect. The Ninth Circuit held that the officers' conduct had been reasonable and proper, so they could not be liable for excessive force. *Id.* at 916. The plaintiff argued that even if the conduct of the individual officers was objectively reasonable, the municipal defendants could still face liability under *City of Canton*. The Court disagreed, responding that "[w]hile the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights." *Id.*

The Ninth Circuit discussed all of these opinions in *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002). In *Fairley*, police officers held the plaintiff for twelve days on outstanding warrants for his twin brother. After his release, the plaintiff filed claims against the officers for excessive force and arrest without probable cause. He also asserted claims against the city under *Monell*. *Id.* at 915. The question on appeal was whether the city could be held liable once the officers were exonerated. The Ninth Circuit held that *Heller* and *Scott* controlled the excessive force claim. Therefore, "[e]xoneration of [the officer] of the charge of excessive force preclude[d] municipal liability for the alleged unconstitutional use of such force." *Id.* at 916. However, the Court held that those decisions had "no bearing" on the plaintiff's Fourth and Fourteenth Amendment claims against the city for arrest without probable cause and deprivation of liberty without due process. *Id.* at 916–17. "These alleged constitutional deprivations were not suffered

as a result of actions of the individual officers, but as a result of the collective inaction of the . . . Police Department." *Id*. at 917. As a result, "the district court did not err by denying the City's motion for judgment as a matter of law on the *Monell* claim based on the jury's exoneration of the individual officers alone." *Id*.

Synthesizing these cases, it is clear that municipal liability may attach in the absence of individual liability under certain circumstances. Municipal liability may attach if, for example, the plaintiff cannot identify the specific state actors who deprived her of her constitutional rights, or if the constitutional deprivation is the result of the collective action or inaction of a group of state actors. *See, e.g.*, *id*. In such cases, it is relatively easy to identify the constitutional deprivation, and as the Ninth Circuit underscored in *Scott*, municipal liability is always "contingent on a violation of constitutional rights." 39 F.3d at 916. Where there is only one relevant state actor responsible for the plaintiff's harm, and that state actor is found not to have deprived the plaintiff of a constitutional right, it is difficult to conceptualize a constitutional deprivation attributable to the government entity, the *Hopkins* dicta notwithstanding. Although I am skeptical that such a case exists, I need not decide that issue here. In this case, any harm caused by TriMet policies, customs, or failure to train Ms. Day was identical to, if not less than, the harm caused by Ms. Day herself. Therefore, if Ms. Day did not deprive plaintiffs of a constitutional right, nor did TriMet.

In light of the foregoing, TriMet's motion for summary judgment is resolved by my holding that Ms. Day did not deprive plaintiffs of their substantive due process rights under the purpose to harm standard: municipal liability may not attach. Plaintiffs point to TriMet's policies, customs, and failure to train Ms. Day as the source of *Monell* liability. But these alleged policies, customs, and failure to train did not cause harm to plaintiffs in any way beyond the

harm caused by Ms. Day herself. In fact, they may have caused less. Therefore, because I find that Ms. Day did not deprive plaintiffs of a constitutional right, I also find that TriMet did not deprive plaintiffs of a constitutional right. To find otherwise would be to impose *respondeat superior* liability, and such liability is forbidden under § 1983. As a result, TriMet's motion for summary judgment is granted.

## III. <u>Plaintiff's Motion for Summary Judgment</u>

Although granting summary judgment in favor of Ms. Day and TriMet disposes of the consolidated actions before me, plaintiffs' motion for summary judgment has implications for the state court actions currently preparing for trial. Plaintiffs claim they are entitled to summary judgment on defendants' affirmative defense of claim preclusion for two reasons. First, the state court has reserved plaintiffs' right to bring separate trials in state and federal court, and plaintiffs argue that this order is entitled to preclusive effect. (Pope Decl. [60] Ex. 4.) Second, the ends of justice require that I decline to exercise supplemental jurisdiction over plaintiffs' state law claims. I disagree on both accounts.

### A. *State Court Order*

"The Full Faith and Credit Act . . . requires the federal court to give the same preclusive effect to a state-court *judgment* as another court of that State would give." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986)) (emphasis added). Here, the state court order reserving plaintiffs' right to bring separate trials in state and federal court is not a final judgment. As a result, plaintiffs' motion is premature and must be denied.

**B. *Supplemental Jurisdiction***

To avoid any question of claim preclusion in the state court actions, plaintiffs request that I decline to exercise supplemental jurisdiction over all state law claims arising out of the April 24, 2010 collision. Under 28 U.S.C. §1367, a district court may decline to exercise supplemental jurisdiction over a claim if "the claim raises a novel or complex issue of State law" or "there are other compelling reasons." I cannot decline jurisdiction over claims that are not before me, however. Plaintiffs' motion for summary judgment is therefore denied.

## CONCLUSION

The victims of the worst bus/pedestrian collision in TriMet history and their families are justified in seeking all available remedies. They deserve one. But the Fourteenth Amendment, which was never intended as a "font of tort law," cannot provide it. Therefore, Ms. Day's motion for summary judgment [64] is GRANTED, TriMet's motion for summary judgment [67] is GRANTED, and plaintiffs' motion for partial summary judgment [58, 62] is DENIED.

IT IS SO ORDERED.

DATED this __28th__ day of June, 2013.

/s/ Michael W. Mosman ___
MICHAEL W. MOSMAN
United States District Judge